Filed 8/8/16  P. v. Means CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B259605 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA077121) |
| v. | |
| JEFFREY MEANS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gary J. Ferrari, Judge.  Reversed in part; otherwise affirmed.

David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In this appeal from convictions for the 1996 and 2007 murders of two victims, Jeffrey Means contends with respect to one conviction that evidence was improperly admitted in violation of his rights under the Confrontation Clause of the federal Constitution and the rules barring the use of hearsay; and with respect to the other conviction that the jury was left with insufficient evidence and insufficient guidance from the trial court to support its finding of premeditation. We reverse the first of these convictions, and affirm the second.

## Background

**I.    The Hal Shaw Murder**

**A. Shaw is found dead.**

In 1996, Hal Shaw, a tall and thin 48-year-old, lived in a home in a densely populated Whittier neighborhood. Although he lived alone, he was known as a "happy emotional drunk," who would drink day and night, and often pass out with frequent visitors—including Means.

Shaw left a voicemail on a neighbor's phone sometime before 11:00 p.m. on June 11. About 7:25 a.m. on June 12, another neighbor noticed as she left for work in her black Nissan Stanza that Shaw's carport area gate was closed and a blue Dodge Colt was on jack stands in the carport.

Sometime between 9:00 a.m. and noon on June 12, 1996, a cable installer arrived at Shaw's home to install a TV box. He discovered Shaw on the floor, and the kitchen floor smeared with blood and a yellowish liquid. He called 911.

When the police arrived the gate was open, the carport was empty, and Shaw's body was lying on the floor, with blood on his head, spattered on the walls, ceiling, and couch, and bloody rags and a flannel shirt that appeared to have been used to wipe the floor. There were no signs of forced entry, and the house had not been ransacked. A yellow gelatinous liquid was on the floor, an empty dish soap container was in the trash can, and a partially used dish soap bottle was on the counter. A car jack riser and a piece of petrified wood, with blood on them, were on a chair near Shaw's body.

2

The autopsy report indicated that Shaw had suffered 34 fatal blunt trauma wounds, mainly to his head, along with nonfatal incise wounds, including defensive wounds to his head and arms. He had a blood-alcohol level of 0.13 when he died.

**B. Police Investigation.**

Sometime around noon on June 12, a teenage neighbor was with Means as he worked on a car in the driveway of his girlfriend's nearby home. She recalled that her sister's boyfriend—known also to Means—approached them saying that someone had been killed at Shaw's house; but she (and apparently Means) disregarded the statement as a lie or a joke. Means went back to working on the car.

About 2:00 p.m., Means approached an officer at Shaw's home, explaining that he had stayed at Shaw's house the night before and wanted to clear his name with the police. In two recorded interviews at the Whittier police station, Means said he had worked on Shaw's car, on jacks, during the day on June 11, and had left the jack stands outside the house when he was done. He told the police that he and Shaw had spent the night of June 11 drinking and calling phone-sex lines until 3:30 or 4:00 a.m., then slept until Means left sometime between 6:00 and 8:00 a.m. (the same time he saw a neighbor leave in her black Nissan Sentra). Shaw had been alive when he left the house, and his car was in the carport. Means came out and closed his gate at the same time. According to Means, he had spent the morning walking around, or going to the market, until shortly before he approached the police.[1] Shaw's car was recovered that evening.

Sometime after his interviews with Means, Detective Mehelic saw what appeared to be a spot of blood on the heel of Means's left shoe, and yellow streaks apparently matching the liquid found in Shaw's kitchen. He booked the shoes into evidence. At his request the shoes were passed on to criminalist Kenneth Sewell of the Los Angeles Sheriff's crime lab, where they were examined by criminalist Valorie Scherr.

---

[1] During their interviews with Means, the police confronted him with a number of apparent inconsistencies (actual and apparent) that conflicted with his description of events. They noted his apparent inconsistencies, and that he had become angry and "shadow boxed" when left alone in the interview room.

Scherr did not testify.[2] Sewell, her supervisor, testified to Scherr's examination of the shoes and the results of her analysis, referring to her diagrams, the contents of her notes, and her report. Scherr's diagrams, notes, and report were admitted into evidence—over Means's objections on hearsay and Confrontation Clause grounds—as exhibit 54. Documentation of other crime lab results were used to refresh Sewell's recollection, but objections to their admission into evidence were sustained.

Sewell testified that Scherr's notes and report stated that she found stains she identified as blood on the left edge of Means's left shoe, and the right side of his right shoe, and found some yellow stains on the shoes. Scherr sent blood samples from the shoes, along with other clothing items and comparison blood samples from both Means and the victim, to a private serological laboratory (Serological Research Institute, or SERI) for DNA testing. They were initially tested in 1996; in 2000, SERI conducted further DNA testing at the Sheriffs' department's request, after more advanced DNA testing technology had become available.

Thomas Fedor, a forensic serologist at SERI, testified that in the 1996 tests it was determined that the blood sample from Means's left shoe could have come from Shaw, and could not have come from Means; and under the tests conducted in 2000, the SERI lab confirmed those conclusions to an extremely high degree of possibility. He also testified that even the tiniest contamination of the tested samples from other genetic material (including contamination introduced by mishandling before the samples were sent to the testing laboratory) might be undetectable, and could compromise the test's outcome.

### C. Conviction for Murder of Shaw.

Means was charged in an amended information with Shaw's murder (Pen. Code, § 187, subd. (a)), alleging also his personal use of a deadly weapon (an automobile jack stand) in the offense (Pen. Code, § 12022, subd. (b)(1)), causing the offence to be a serious felony (Pen. Code, § 1192.7, subd. (c)); that he had two prior convictions for

---

[2] Scherr retired in 2000, according to Sewell, her then-supervisor.

4

serious or violent felonies (Pen. Code, § 667, subd. (c)); and that the offence was a special circumstance under Penal Code section 190.2, subdivision (a)(3).

A jury found Means guilty of the June 12, 1996 murder of Shaw, in the second degree; and found true the allegation that he had used a deadly weapon in the commission of the offense.

## II. The Ronald Henry Murder

### A. Henry is found dead.

In 2007, Ronald Henry (who was 67 at the time) periodically employed Means, and others including Andrea Phillips, a long-time close friend of Means, to help with catering jobs he ran from his Long Beach apartment, serving weddings, birthday parties and local festivals. Means had for many years often stayed at Phillips's mother's house, along with Phillips's younger brother Juanan Burdette and various nieces and nephews.

On Monday, December 17, all day and into the early morning hours the next day, Henry, Means, and Phillips were drinking while they prepared for the next day's catered lunch at a senior citizens' home. Henry yelled at Means at some point during the evening, about Means's messing up the kitchen and drinking Henry's liquor. Neighbors later reported having heard a man and a woman's voices arguing.

Henry, Phillips, and Means slept at Henry's house that night (Phillips and Means on couch and chairs), and worked at the catering job until early evening the next day. After paying Phillips and Means for their work, Henry left in his red Impala. Means told Phillips he was taking the van Henry had rented for the catering job to Henry's apartment.

Phillips received a call from Henry sometime in the early evening of December 18, upset, saying he did not have his keys to get into his apartment. Phillips recalled Means saying he had Henry's keys, so she called Means, who said he would take the keys, the van, and the leftover food, to Henry's apartment. She spoke with Henry a number of times that evening, about his continuing need to reach Means for his keys and the van. The last time she spoke with Henry was late that night, December 18, after which she went to sleep.

5

On the evening of December 18, Means picked up Phillips's brother, Burdette, in the van, to go shopping for Christmas presents. While they were shopping at Walmart, Means received a call from Phillips, Burdette's sister, about the need to return the van to Henry. They left Walmart about 9:30 p.m., and Means dropped Burdette off, saying he was going to return the van.

In the mid-afternoon of the next day, December 19, Phillips reached Means on the phone, but he sounded "distant," as if in a trance, saying he did not know where Henry was. About 5:00 p.m. that afternoon, after having tried to reach Henry throughout the day, Phillips went to Henry's apartment. He found the door ajar and some disorder inside—unlike Henry—so she went to get Burdette before going inside. They found Henry lying on the bed, bloody, and called the police after concluding he was dead. Henry had suffered 36 wounds from a knife or other sharp object, many of which were apparently defensive, and one of which—to his neck—was fatal. The murder weapon was not found, but a knife block in the kitchen had one empty slot for a large knife. A large Sparklett's water jug in which Henry kept loose change was missing from Henry's apartment, and his red Impala was also missing. The time of his death was estimated to be between 11:00 p.m. on December 18, and 3:00 a.m. on December 19.

Henry's Impala was later found parked about three blocks from Phillips's and Burdette's mother's house, where Means had dropped Burdette off the night before, and where Means often stayed.

**B. Police Interviews and Other Evidence.**

After hearing of Henry's death from Phillips, Means left a number of voicemail messages with the police asking that they call him about Henry's death. He was interviewed at the Long Beach police station in the mid-afternoon on December 20, and again on January 27, 2008.

In his first interview, Means gave the police an account of his movements during the day or two before Henry's murder: He told the police (with many apparent memory gaps) that after leaving the catering job on December 18, he had unloaded the rented van at Henry's apartment, then had gone shopping at Walmart with Burdette; he had received

6

a call to return to Henry's apartment because Henry was locked out; he helped Henry into his apartment, then left about 3:00 a.m. on December 19 to buy beer at the Food-4-Less store, which he brought back to Henry's apartment at 3:30 or 4:00 a.m.; Henry invited him in, and he "passed out" on the couch until he left the apartment about 6:00 or 7:00 a.m., and had spent the day riding around with a friend. He had called the police after he learned from friends of Henry's death. He denied having anything to do with Henry's death, or knowing who killed him.

In his second police interview, on January 17, 2008, Means repeated that he had dropped Burdette off after his Walmart shopping trip, then went to Henry's house and gave Henry his keys. He stayed at Henry's for a while, then left in Henry's Impala, with Henry's permission, to get dope and to cash-in coins, and perhaps buy beer. After returning to Henry's he again left later that morning, about 3:00 or 4:00, to cash coins. After sitting, drinking, and passing out, he said he left Henry's about 6:30 or 7:00 a.m. Means denied knowing Henry's change jar was missing, and denied having taken the change.

A surveillance video showed that Means arrived at the Food-4-Less store in the rented van about 12:23 a.m. on December 19; that he used the store's coin machine to exchange $43.21 in change for cash, then left the store. At 2:49 a.m., Means returned to the store in the rented van and exchanged an additional $6.68 in coins, then left.

DNA examination showed that a blood stain from Henry's inside pants pocket had a DNA profile showing Henry as the stain's major contributor, and Means as a possible minor contributor. A small bloodstain found on the inside of the Impala's door was Henry's, and excluded Means as a source. Other DNA samples taken from other sources also excluded Means as a contributor.

When the police found and processed Means's Impala, they found the seat at an appropriate distance from the steering will for a driver Means's height (about 5 feet 6 inches tall), but far too close for someone Henry's size—about 6 feet 1 inch tall.

7

### C. Conviction for Murder of Henry.

Means was charged in an amended information with Henry's murder (Pen. Code, § 187, subd. (a)), alleging also his personal use of a deadly weapon (a knife) in the offense (Pen. Code, § 12022, subd. (b)(1)), causing the offence to be a serious felony (Pen. Code, § 1192.7, subd. (c)); and that he had two prior convictions for serious or violent felonies (Pen. Code, § 667, subd. (c)). A jury found Means guilty of the December 19, 2007 murder of Henry in the first degree; and found true the allegation that he had used a deadly weapon in the commission of the offense, and the special circumstance that he had been convicted of at least one crime of murder. (Pen. Code, § 190.2, subd. (a)(3).)

## Discussion

With respect to Shaw's murder, Means contends that the court's admission of documents prepared by a nontestifying criminalist, Scherr, and testimony by Sewell about those documents, violated his rights under the Confrontation Clause of the United States Constitution, as well as constituting inadmissible hearsay under Evidence Code section 1200 et. seq., which errors require reversal of his conviction for Shaw's murder.

With respect to his first degree murder conviction for Henry's murder, Means contends that there is insufficient evidence to support the jury's finding that the murder was premeditated and deliberate; and that the trial court erred prejudicially by failing to respond to a question from the jury about premeditation, which errors require reversal of his conviction for Henry's murder.

## I. The Hal Shaw Murder

### A. The Use Of Testimonial Evidence From A Non-Testifying Declarant Violated The Defendant's Constitutional Right To Confront Witnesses.

The Sixth Amendment to the United States Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses. In *Crawford v. Washington* (2004) 541 U.S. 36, the United States Supreme Court overruled earlier precedents to "create[] a general rule that the prosecution may not rely on 'testimonial'

8

out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination." (*Id*. at p. 59; *People v. Lopez* (2012) 55 Cal.4th 569, 576.) Means contends that the admission of exhibit 54 at trial, and the use of other exhibits in connection with the testimony of various witnesses, violated the rule set forth in *Crawford v. Washington*, and that it constituted illegal use of hearsay evidence.

### 1. Evidence from non-testifying declarants was used to show that Shaw's blood was found on Means's shoes.

Sewell, a Supervising Criminalist in the Los Angeles County Sheriff's Department Scientific Services Bureau (Sheriff's crime lab) was responsible both for field investigation of the work done by criminalists (such as crime-site collection and documentation of evidence), as well as the laboratory analysis of the evidence collected. Sewell testified that the Sheriff's crime lab provides full-service laboratory services to 50 or more police agencies that are active in Los Angeles County; that each investigation is identified by file number, and includes notes, work sheets and diagrams prepared at or near the time a criminalist performs the reported task; that as supervising criminalist, he had access to these files; and that the files are detailed enough that he, and any qualified criminalist, could determine whether the work done was reliable. The documents and reports resulting from the lab's investigations are made in the regular course of its business. Sewell testified that from the laboratory files, including notes, work sheets, and diagrams prepared by criminalists under his supervision at or near the time of their examination of the subject evidence, he (or any other qualified criminalist) could determine whether the work performed was reliable.

In June 1996, Valorie Scherr (since retired) and Manuel Munoz were criminalists working under Sewell's supervision. On June 14, 1996, Sewell and Munoz had gone to Shaw's residence at the request of Detective Mehelic of the Whittier Police Department, to assist in the collection and interpretation of evidence following Shaw's murder. At that time they received (and documented the lab's receipt of) various items from the

9

Whittier police, among them a pair of white tennis shoes purportedly obtained from Means.

Sewell identified exhibit 53, comprised of three pages of black-and-white copies of various photographic views of the white athletic shoes Sewell and Munoz had received from the Whittier Police Department (identified by their laboratory receipt numbers and Whittier Police Department file number). There was no objection to Sewell's identification of exhibit 53, or to its display to the jury. He explained that the crime lab "was asked to look at these shoes for possible evidence," and that Scherr "examined the shoes for blood in this case," and that as part of her assignment, she made diagrams, wrote notes, and prepared a report of her analyses of the shoes and other items of evidence. Sewell identified Scherr's five pages of diagrams, notes, and report concerning the shoes, which were marked as exhibit 54 for identification. The three-page report signed by Sewell and Munoz, of their June 14, 1996 field investigation and the items received by the Sheriff's crime lab, was marked as exhibit 55 for identification. And exhibit 56 for identification was Scherr's laboratory examination report of her preliminary screening and testing of various materials.[3]

After identifying these exhibits, Sewell testified that exhibit 55 reflects his and Munoz's observations of blood stains in a particular area of Shaw's house, and of yellow gelatinous liquid on the floor. In doing so he quoted from exhibit 55 (without objection), that "'upon entering the kitchen, noticeable blood smears were evidenced on the kitchen floor adjacent to a yellow gelatinous material on the kitchen floor. An apparent cleanup was performed at this location in the kitchen.'"

---

[3] According to exhibit 55—Sewell's and Munoz's field investigation report—the items submitted to them by the Whittier police, in addition to the white athletic shoes received "reportedly from Means," included representative blood spatters and yellow gelatinous material collected from various areas in Shaw's house, various bloody cloth items, clothing received "reportedly from Means," a bloody jack riser, and hair exemplars and fingernail scrapings obtained from the coroner's office and from Means at the Whittier jail.

10

The prosecution's questioning of Sewell then turned from exhibit 55, "to the notes by Miss Scherr, let's go ahead and do that diagram, [exhibit 54]." Means's counsel immediately interrupted with a "foundational hearsay objection as well as a Confrontation Clause objection" based on the federal and state Constitutions. The objection was overruled, but the trial court confirmed that it would be understood as a continuing objection. Questions by the prosecution concerning exhibit 54's diagrams and facts then continued for another nine transcript pages, until the conclusion of Sewell's direct-examination.

## 2. The absence of any objection to testimony concerning exhibits 53, 55, and 56 precludes Means's appeal based on the use of these exhibits.

Means contends on appeal that the trial court erred, and he was prejudiced, by the use of exhibits 53, 54, 55, and 56 in connection with Sewell's testimony, and by the admission of exhibit 54 into evidence. But the record reflects no objection to the use of exhibits 53, 55, and 56 in connection with Sewell's testimony, and these exhibits were not admitted into evidence, precluding Means's appeal on these grounds. (Evid. Code, § 353; *People v. Geier* (2007) 41 Cal.4th 555, 611.)

Means contends that the target of his trial court objection was not only exhibit 54, the subject of the question that his objection interrupted. He contends that because the objection came "[w]hen the prosecutor got ready to start asking questions about the documents prepared by Scherr," the objection "was sufficient to preserve the issues raised in this appeal" with respect not just to exhibit 54, but also with respect to exhibits 53, 55, and 56.[4]

The record does not support this contention. The objection came after Sewell had testified, without objection, to significant portions of the contents of exhibit 55; it was interposed only when he was asked to "tell us what that [exhibit 54] is?" And once the court overruled the objection to that question concerning the contents of exhibit 54, Sewell continued his direct-examination testimony about exhibit 54 at some length,

_____

[4] Means's reply brief confines its argument concerning error in the admission of these exhibits to exhibits 54 and 56—Scherr's diagrams, notes, and reports.

11

without again mentioning exhibits 53, 55, or 56. The record reflects no trial court objection to testimony about the contents of exhibits 53, 55, or 56; the objection came only when Sewell was asked about the contents of exhibit 54.

Counsel for Means renewed his hearsay and Confrontation Clause objections to exhibit 54 at the close of the prosecution's evidence. He argued that exhibit 54 should be excluded from evidence, because in that document "there are diagrams" and "a great deal of writing, which may go beyond what was testified to," and because the document's author was not present to be cross-examined. The court overruled these objections and ordered exhibit 54 admitted into evidence.

Means's counsel also objected at that time to the admission of exhibits 55 and 56 into evidence (without mentioning exhibit 53). The objection to exhibit 55 was "the same objection" that counsel had made to exhibit 54, that "again there is a great deal of narrative on here beyond what was testified to. I believe Mr. Sewell . . . used it basically to say on direct and on cross, which items were tested and . . . what in fact was tested. But the exhibit itself goes far beyond it. There is . . . 4 paragraphs of lead-in before you get into the actual items that were tested." The objection to exhibit 56 was "similar to People's 55, except I believe this one has the conclusions and it was, I think, used in the same manner to refresh Mr. Sewell's recollection of what was tested and what the results were of those tests."

While objecting to the admission of exhibits 55 and 56 into evidence, however, counsel did not indicate that there had been any earlier objection to the use of those exhibits during Sewell's testimony, or that their use in connection with Sewell's testimony had been error. Counsel expressly conceded that their use during Sewell's testimony was appropriate—that "certainly he can refresh his recollection with that"—but argued that nevertheless "I don't think it should be admitted into evidence." The court

apparently agreed, for it sustained the objections, and exhibits 55 and 56 were not admitted into evidence.[5]

Sewell's testimony about exhibits 53, 55, and 56 had been presented without objection, and the court was not requested at any time to exclude or strike any portion of it.  On this record, Evidence Code section 353, subdivision (a), precludes this court from granting the relief sought by Means's appeal—reversal of the judgment—even if we were to conclude that the testimony might have been excluded had an objection or motion been made.[6]  But here, there was no objection to Sewell's testimony about the contents of these exhibits, and there was no motion to exclude or strike that testimony, or to instruct the jury to disregard it.

Means citation of *People v. Holmes* (2012) 212 Cal.App.4th 431, 435-436, for the proposition that his "running objection" to testimony about exhibit 54 preserved his right to challenge the use of testimony about contents of other exhibits, is inapposite.  That case held that the appellant's hearsay objections preserved his right to raise the Confrontation Clause issue on appeal, because "the context makes clear that the court and opposing counsel were aware that the confrontation clause was the basis of the hearsay objection."  (*Id.* at pp. 435-436.)  Here (as in *People v. Holmes*), the objection plainly was intended and understood to encompass both hearsay and Confrontation Clause grounds; but the record discloses no intention or understanding that the objection was to anything other than exhibit 54 and its contents.  And counsel's later concession that Sewell was entitled to use the exhibits to refresh his recollection refutes any such intention.

---

[5] The court's minute order identifies the exhibits excluded and withdrawn after the close of evidence, reciting that "all remaining exhibits"—apparently including exhibit 53—"are admitted."

[6] Evidence Code section 353, subdivision (a), provides:  "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."

13

The failure to object to Sewell's testimony concerning exhibits 53, 55, or 56, or to move to strike the testimony and to instruct the jury to disregard it, waives any appeal from the admission of unchallenged evidence. (Evid. Code, § 353; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 313-314, fn. 3 [claim of error forfeited by failure to object at trial based on Confrontation Clause]; *People v. Redd* (2010) 48 Cal.4th 691, 730; *People v. Geier*, *supra*, 41 Cal.4th at p. 611.)

3. **The admission and use of exhibit 54 at trial violated Means's constitutional right to confront and cross-examine witnesses against him.**

The extent to which witnesses may testify in criminal trials about the results of scientific testing that they did not personally perform is an issue that has vexed federal and state courts since the United States Supreme Court decided *Crawford v. Washington*, *supra*, 541 U.S. 36, in 2004. *Crawford v. Washington* held that the admission of "testimonial" out-of-court statements violates a criminal defendant's confrontation rights unless the out-of-court declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination (*id.* at p. 68). In *People v. Geier*, *supra*, the California Supreme Court explained that "Under *Crawford*, the crucial determination about whether the admission of an out-of-court statement violates the confrontation clause is whether the out-of-court statement is testimonial or nontestimonial." (41 Cal.4th at p. 597.)

In *People v. Leon* (2015) 61 Cal.4th 569, our Supreme Court provided additional guidance with respect to what makes a statement "testimonial." To be considered "testimonial," it held, an out-of-court statement must meet two requirements: (1) it "'must have been made with some degree of formality or solemnity'"; and (2) the statement's primary purpose "must 'pertain[] in some fashion to a criminal prosecution.'" (*Id.* at pp. 602-603.)[7] A Confrontation Clause problem may arise "when an expert simply recites portions of a report prepared by someone else, or when such a report is itself

---

[7] The court supported these propositions primarily by reference to its own decisions in *People v. Lopez* (2012) 55 Cal.4th 569, 581, 582, and *People v. Dungo* (2012) 55 Cal.4th 608, 619. (*People v. Leon*, *supra*, 61 Cal.4th at p. 603.)

14

admitted into evidence"; but the Confrontation Clause is violated only "if the report was created with sufficient formality and with the primary purpose of supporting a criminal prosecution." (*Id.* at p. 603; *People v. Lopez*, *supra*, 55 Cal.4th at pp. 581-582; *People v. Dungo*, *supra*, 55 Cal.4th at p. 619.)

The majority opinion in *Michigan v. Bryant* (2011) 562 U.S. 344, explained however that "Formality is not the sole touchstone" of the Confrontation Clause analysis (*id.* at p. 366), because the formality or lack of formality in which the challenged statement is clothed is not in all cases a fair measure of the confrontation right's importance. "Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." (*Id.* at p. 358.)[8] The admission of such hearsay violates the Confrontation Clause if the report was created with sufficient formality, and its primary purpose pertains to a criminal prosecution. (*People v. Lopez*, *supra*, 55 Cal.4th at p. 582.) Here, Scherr, a Sheriff's crime lab criminologist, was directed by Sewell, her supervisor, to examine the shoes for evidence that would connect the shoes' owner, Means, with the murder victim, Shaw; exhibit 54 constitutes her report of the results of that assignment— a testimonial statement containing Scherr's own observations and conclusions, prepared with an evidentiary purpose pertaining to a potential criminal prosecution of Means, under circumstances that would lead an objective witness reasonably to believe it would be available for use at a later trial. (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at pp. 310-311.)

Sewell identified exhibit 54 as the five-page document containing the diagrams, notes, and report prepared by Scherr in connection with her assignment by Sewell to examine and report on the shoes and various items of clothing that Sewell and Munoz

---

[8] Means argues forcefully that the cited California Supreme Court decisions with respect to the "testimonial" requirement are not entirely consistent with the analysis of the United States Supreme Court in the controlling decisions of *Ohio v. Clark* (2015) __ U.S. ___, 135 S.Ct. 2173 and *Michigan v. Bryant*, *supra*, 562 U.S. 344. We reach our decision without being required to address this contention.

had been given by the Whittier Police Department for examination.  It apparently was prepared as a part of Scherr's duties as a Sheriff's crime lab analyst, for the purposes of identifying the shoes received by the Sheriff's Department from the Whittier police, and to memorialize the shoes' characteristics, and the locations from which samples of stains were taken from them; it was initialed by Scherr, the analyst who performed the examination and analyses; and it was prepared as a part of the investigation of a crime— Shaw's murder—and of Means as a potential suspect in that crime.

Whatever the degree of formality with which Scherr's descriptions and diagrams in exhibit 54 (to which Sewell was permitted to testify over objection) are characterized, they must be classified as within the category of "testimonial" evidence.  When Scherr prepared exhibit 54, Sewell's and Munoz's report (exhibit 55) had already stated that Means was the subject of the investigation of Shaw's murder; and that the crime scene was covered with blood and a yellow gelatinous liquid, which was collected for crime lab analysis.  Sewell testified that Scherr's notes and report stated that her preliminary tests indicated that the stains she had diagramed on the left edge of Means's left shoe were blood; and that she had sent samples from these stains to the SERI lab for DNA testing.  Specifically, Sewell testified that exhibit 54 shows that Scherr identified a very small stain on the left edge of the left side as blood; that she also found some blood on the right side of the right shoe, as shown on her diagram; and that she found some yellow staining on the shoes, that she was not able to identify.  He testified that "the notes show" that samples were collected from the stains identified as blood, and were sent to an outside laboratory for testing.  He did not purport to use Sewell's notes and diagrams as a basis for his own expert analysis of the location or contents of the stains on Means's shoes, but instead simply testified to the contents of Sewell's diagrams and notes themselves.  (See *People v. Leon*, *supra*, 61 Cal.4th at p. 603 [Confrontation Clause problem may arise

16

when expert "simply recites portions of a report prepared by someone else, or when such a report is itself admitted into evidence"].)[9]

Over Means's objections, exhibit 54 was admitted into evidence, and Sewell was permitted to recite its contents, containing her observations and the manner in which she had collected and transmitted the blood samples to the testing laboratory. These facts were shown only by Scherr's diagrams and notes, and Sewell's recitation of them. Scherr was not produced to testify to the accuracy of her diagrams regarding the sources of the samples collected and sent for laboratory analysis, or of her report of the procedures she had followed in doing so. We may doubt whether Scherr's appearance and cross-examination would have revealed any facts further significance; but the record provides us with no basis on which to conclude they would not.

### 4. The error in the admission and use of exhibit 54 requires reversal of Means's conviction for the murder of Shaw.

The error in admitting exhibit 54 into evidence, and in overruling Means's continuing objection to Sewell's testimony about its contents, cannot be found to be harmless beyond a reasonable doubt—the applicable standard for error of constitutional proportions. (*Chapman v. California* (1967) 386 U.S. 18, 24 ["before a federal constitutional error can be held harmless, the court must be able to declare . . . that it was harmless beyond a reasonable doubt"].) The contents of exhibit 54, and Sewell's testimony about them, showed that Scherr had preliminarily determined that some samples taken from Means's shoes were blood, and that they were collected and sent to an outside laboratory for further DNA testing. That evidence did not itself show that samples taken from Means's shoes contained Shaw's DNA; but nevertheless was important evidence of the critical connection between Means's shoes and Shaw's DNA.

---

[9] Although the briefs discuss the claimed errors in terms of cases involving the admission of DNA evidence, Scherr's exhibits contain no DNA evidence; they were used to identify the source of the samples that were tested by the SERI lab. The results of DNA analysis came not from Scherr's documents or Sewell's testimony about them, but from Fedor, the SERI lab analyst.

Following Sewell's direct-examination identification and testimony concerning exhibits 55 and 56, without objection, the questioning turned to exhibit 54—prompting Confrontation Clause and hearsay objections by Means's counsel; and then questioning concerning each page of exhibit 54 after the objections were overruled.[10]

Sewell identified exhibit 54's first page as Scherr's basic summary of "what she has to work with" in her laboratory analysis as a criminalist in this case; Scherr's descriptions of the items—the shoes—she had received from Sewell and Munoz, along with the identifying evidence numbers for each item. The second page of exhibit 54 he identified as Scherr's diagram of the left side of the left shoe, showing where she found a small stain, which her preliminary testing indicated was blood. The third page Sewell identified as Scherr's diagram of the right side of the right shoe, where she identified the location of certain stitching and leather with "no visible stain"; Sewell testified that this was "a weak area of the shoe which [Scherr] tested and found a positive presumptive tests for blood [*sic*]" on the dark leather area on the right side of the shoe. Exhibit 54's fourth page Sewell identified as Scherr's diagram of the right shoe showing the stained areas in greater detail. Sewell testified that Scherr tested for blood in a number of stained areas, some of which tests were negative, some were positive. The last page of exhibit 54 was described by Sewell as Scherr's diagram of the left side of the left shoe, showing areas in which she found dark stains and obtained positive results on her preliminary tests for blood.

Sewell compared certain of the stains shown on the diagrams on the last page of exhibit 54 with exhibit 49 (the shoes), testifying that Scherr had been unable to identify the yellow stains she had found on the shoes. Finally, Sewell testified that Scherr had collected samples of certain of the stains she had identified as blood that were too small

[10] Sewell's direct-examination identified exhibit 56 as "a three-page document signed by Valorie Scherr dated July 17, 1996," consisting of Scherr's laboratory examination report concerning evidence she examined and analyzed after Sewell's and Munoz's field investigation. And he quoted various portions of exhibit 55's descriptions concerning the blood and yellow liquid he and Munoz had observed and collected from the crime scene, all without objection.

for testing by the Sheriff's crime lab, and that she had sent those samples for testing by SERI, a private serological laboratory.[11]

The probative value of a key item in the prosecution's case against Means—the DNA results identifying Shaw's blood on Means's shoe, to which Fedor testified—therefore rests in large measure of the probity of Scherr's observations, collection, and transmission of the samples taken from Means's shoes, as set forth in exhibit 54—the report of Scherr's work as a criminalist in the Sheriff's crime lab—to which Sewell testified. Scherr, a Sheriff's crime lab criminologist, was directed by Sewell, her supervisor, to examine the shoes for evidence that would connect the shoes' owner, Means, with the murder victim, Shaw. Exhibit 54 constitutes her report of the results of that assignment—prepared with a clear "evidentiary purpose," under circumstances that would lead an objective witness to reasonably believe they would be available for use at a later trial. (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at pp. 310-311.) Without that report, the trial record would contain nothing to show that the samples received by the SERI lab contained blood, or the chain of custody of the samples (collected from the stains on Means's shoes and the comparison samples of Means's and Shaw's blood), with the results of the DNA tests conducted by the SERI lab.

The jury had before it substantial evidence of Means's involvement in Shaw's murder. But no evidence provides such powerful proof as to compel the conclusion that his conviction was inevitable beyond a reasonable doubt. For that reason, the Confrontation Clause error requires reversal of the conviction for the murder of Shaw. (*Chapman v. California*, *supra*, 386 U.S. at p. 24 ["before a federal constitutional error

---

[11] Sewell's cross-examination also included some testimony about facts referenced in exhibit 53 (photocopies of the white shoes), exhibit 55 (the Sewell/Munoz field investigative report), and exhibit 56 (Scherr's supplemental laboratory report). He was questioned about the small size of a stain shown in exhibit 53; he had no knowledge about the nail scrapings, whose collection is shown in exhibit 55; and he confirmed that the lab's preliminary tests of stains on various items of Means's clothing (socks, T-shirt, sweat pants, boxer shorts) showed no DNA originating from Shaw.

can be held harmless, the court must be able to declare . . . that it was harmless beyond a reasonable doubt"].)

## II.    The Ronald Henry Murder

### A. Substantial Evidence Supports The Jury's Finding That The Murder Of Henry Was Deliberate And Premeditated.

Means argues that the evidence was insufficient to show beyond a reasonable doubt that his murder of Henry was deliberate and premeditated.  We find that substantial evidence supports his conviction for Henry's murder in the first degree.

Murder is "the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).)  First degree murder is any "willful, deliberate, and premeditated killing."  (Pen. Code, § 189.)  In evaluating the sufficiency of the evidence to show deliberation and premeditation, "'we must "review the entire record, and drawing all reasonable inferences in favor of [the judgment], . . . determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]'"  (*People v. Manriquez* (2005) 37 Cal.4th 547, 576.)  We may not substitute our judgment for that of the jury.  "If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding."  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)  In conducting such a review, we "'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'"  (*People v. Avila* (2009) 46 Cal.4th 680, 701.)  This standard of review therefore requires that we affirm the conviction unless "upon no hypothesis whatever is there sufficient substantial evidence" to support the jury's determination.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, the Supreme Court identified three categories of evidence that can show premeditation and deliberation:  planning activity, motive, and manner of killing.  But the court also later explained that this list is not exhaustive, nor are these factors exclusive.  (*People v. Pride* (1992) 3 Cal.4th 195, 247.)  "'*Anderson* does not require that these factors be present in some special

20

combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]' Thus, while premeditation and deliberation must result from '"careful thought and weighing of considerations"' [citing *People v. Anderson*, *supra*, 70 Cal.2d at p. 27], we continue to apply the principle that '[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]'" (*People v. Bolin*, *supra*, 18 Cal.4th at p. 332.)

Means's challenge to the sufficiency of the evidence of premeditation and deliberation argues that the evidence of Henry's murder shows a total lack of planning, and lack of any motive sufficient to justify the murder; and that the manner in which the murder was committed provides no basis on which to infer premeditation. We disagree, and conclude that the jury's contrary conclusion is supported by substantial evidence.

Henry was killed in the bedroom of his house. His autopsy revealed that he had 36 injuries of three categories, all inflicted by a sharpened tool such as a knife. He suffered three stab wounds, 32 incise wounds, and one poke wound. Only one of the wounds was fatal: an incise wound that severed the veins and arteries on the left side of Henry's neck. That wound would have resulted in Henry's death within a few minutes of its infliction.

Many of Henry's wounds appeared to be defense wounds, suffered to the palms and backs of his hands, and to his arms, such as would be suffered from trying to grab an attacker's knife or the hand of someone attacking him with a knife. The autopsy indicated that it took Henry a few minutes to die, during which he incurred wounds while trying to defend himself. The medical officer who performed the autopsy estimated the time of Henry's death to have been between 11:00 p.m. on December 18 and about 3:00 to 4:00 a.m. on December 19, 2007. The murder weapon was not recovered. But

21

(despite Henry's habit of keeping his apartment very orderly and clean) a knife block in the kitchen had an empty slot, for a "larger-type of knife."

From this evidence the jury could reasonably infer that before going to the bedroom to attack Henry, his attacker had first gone to the kitchen to remove a knife from the kitchen knife block—showing deliberation and premeditation. (*People v. Steele* (2002) 27 Cal.4th 1230, 1250 [evidence defendant took fatal weapon into victim's home makes it reasonable to infer he had considered possibility of homicide]; *People v. Wharton* (1991) 53 Cal.3d 522, 547 [planning for homicide can be inferred from evidence that defendant removed fatal weapon from another location before murder]; see *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1115 [sufficient evidence of premeditation and deliberation found in *People v. Perez* (1992) 2 Cal.4th 1117, where defendant's entering a house and obtaining a steak knife from a kitchen was held properly indicative of planning activity, even where knife attack was brutal and frenzied].)

There was also evidence that Henry carried, and often flashed, large amounts of cash for his catering business in his front pants pockets—"roughly" $600, Means told the police. In addition, Henry had for many years kept a large bottle of loose change in his living room, which was missing from his apartment after his death. Security surveillance videos from a local food store showed that in the early hours of December 19, 2007—during the period identified as Henry's probable time of death—Means twice arrived at the store in the rented U-Haul truck, where he used the store's coin machine to convert about $50 in loose change into cash.

Although far from overwhelming evidence of a clear motive to kill, this nevertheless provides substantial evidence from which the jury could reasonably conclude that Means acted during his early morning drinking binge with Henry, with deliberation and premeditation (though obviously not good judgment). The jury could reasonably conclude (for example) that, beguiled by what seemed to be available cash, Means obtained a knife from the kitchen before proceeding to Henry's bedroom to attack Henry, and to continue the attack from which Henry perished; that he obtained the cash

22

from Henry's pocket; and that he then attempted to clean up the apartment, and to add to his booty the modest amount of additional cash from Henry's coin collection.

Finding that there is sufficient substantial evidence to support the jury's determination, we affirm the conviction for Henry's murder in the first degree. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 331.)

**B. The Trial Court Did Not Err In Declining To Provide The Jury With Further Instruction On The Issue Of Premeditation.**

The jury was instructed with respect to deliberation and premeditation (in part) that "One premeditates by deliberating before taking action." The instruction continued: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the ideal of deliberation, it is murder of the first degree." The instruction went on to tell the jury that it is not the length of time that is decisive, but that "[t]o constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice, and having in mind the consequences, he decides to and does kill." As far as the record shows, the defendant had no objection to this instruction, and made no request for any different or additional instruction on the subject.

During its deliberations, the jury sent a message to the court: "Does premeditation necessarily precede only the initial violent action, or can it also precede each subsequent blow/strike?" The court's minute order for that date states that the jury's "request for clarification" was received about 10:30 a.m. on the second day of deliberations; that counsel were notified; and that shortly before 11:00 a.m. "the jury receive answer from the court and counsel via the court clerk."

In a post-trial hearing to settle the record on appeal, the trial court held that the jury's inquiry "was returned without an answer." The court recited that it had read the jury's question to counsel, "and my recollection is that there was no way I was going to

23

answer that question."[12]  The record reflects no objection by counsel, and no request that any other response be provided to the jury in the trial court.  According to the trial court (without disagreement from trial counsel) "we did not provide any other answer other than that.  That I'm absolutely convinced on."  As Means's appellate counsel responded on the post-trial record, the finding that no response had been given to the jury's inquiry—consistent with the record showing "a blank space where an answer would be" on the jury-question form—"makes sense to me."  Means contends on appeal that the failure to respond to the jury's inquiry was a prejudicial breach of the trial court's duty under Penal Code section 1138.

Section 1138 of the Penal Code provides that if the jury "desire[s] to be informed on any point of law arising in the case" during its deliberations, "the information required" must be given in open court in the presence of counsel.  That means that "the trial 'court has a primary duty to help the jury understand the legal principles it is asked to apply.'" (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1015.)  But it "does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*Ibid.*)

By characterizing the error as a failure by the trial court to perform its mandatory duty "to consider how best to aid the jury," Means contends that the claim of error is not forfeited by his failure to interpose any objection in the trial court.  For this argument Means offers as an analogy the rule that the court's sua sponte duty to instruct on a lesser included offense supported by the evidence is not forfeited by counsel's failure to request the instruction.

But here, the court's duty is not to provide the jury with an identified instruction, as it was in *People v. Brothers* (there, to instruct the jury on a lesser included offense shown by the evidence).  Here, the duty is only to exercise discretion to determine

_____

[12] Counsel for the People was present in court; Means's counsel appeared by telephone.

24

whether an unidentified instruction should be provided. And here—much as when counsel objects to evidence without informing the court of the nature of the objection—Means's counsel did not indicate to the court that any response should be provided, or the nature of the response he believed was called for by the jury's inquiry.

It is unquestionably true that trial courts have a duty to consider how best to aid the jury in response to an inquiry. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) But nothing in the record shows that the trial court failed in this case to fulfill that duty. True, the court stated (in the post-trial hearing concerning the record on appeal) its recollection "that there was no way I was going to answer that question." But the record also shows that the court convened a hearing to inform counsel of the jury's question, and its intended response, to which neither counsel objected—much less suggested any response that could have, or should have, been given instead.

Nor does Means's opening brief identify any response that should have been given in response to the jury's inquiry, or explain how and why Means was prejudiced by the court's failure to give such a response. Not until his reply brief does he suggest that "the jurors' confusion could have been cleared up" by telling them that the prosecution needed to prove Means premeditated before striking the fatal blow. But the instruction that the jury had initially received—and on which it ultimately rested its verdict—stated essentially the same thing: that "One premeditates by deliberating before taking action," and that the murder was of the first degree if it "was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the ideal of deliberation, . . ."[13]

---

[13] The presumption of innocence, the fact that it was the prosecution's burden to establish deliberation and premeditation, and that a murder is of the second degree where the evidence is insufficient to prove that it was done with deliberation and premeditation, were the subjects of other instructions.

Having been told in response to its inquiry to consider the court's instructions, the jury must be presumed to have determined that Means's actions were "preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation . . . ." Had that not been so, it could not have concluded—as Means argues it must—that premeditation must have occurred before he completed the acts that caused Henry's death. On these grounds we find the trial court's exercise of discretion to decline to instruct the jury further, with counsel's concurrence, was fully justified, and resulted in no prejudice.

## Disposition

The judgment of conviction for the murder of Hal Shaw is reversed. In all other respects the judgment is affirmed.

NOT TO BE PUBLISHED.


CHANEY, Acting P. J.


We concur:


JOHNSON, J.


LUI, J.


26